and Jeffrey Whaley. Arguments not to exceed 10 minutes for each defendant, 20 minutes for the plaintiff, Mr. Stovall for the appellant. Good morning, your honors. I'd like three minutes for rebuttal. You may. The key evidence in the case against Mr. Kerley was opinion testimony that was based on specialized underwriting knowledge, but was improperly admitted under Rule 701 as lay opinion. The underwriting testimony addressed the materiality of the key issue in the case against Mr. Kerley and the only misrepresentation that the district court found he was involved with. And that's misrepresentations concerning the source of down payments or closing payments for stated income or no document loans. The underwriting guidelines for those loans were focused on a borrower's credit history, not the source or amount of any down payment. And in fact, the underwriting guidelines did not require a down payment for these types of loans. But the underwriter's testimony was that the source of closing payments was material, and the underwriters told the jury that if the lenders had known the borrowers weren't funding those payments, the loans would have been rejected. That testimony violated Rule 701 in two ways. First, it was based on a reasoning process that is not familiar to an ordinary person. Underwriting is not basic math. It's not computational. An underwriter analyzes information about a borrower in light of the applicable guidelines and interprets and applies those guidelines to a specific transaction based on her experience and training. A layperson doesn't have that experience and training. And here's one way to put the point. Even if a layperson had all the same facts, could perceive all the same information that an underwriter perceived, the layperson could not analyze it the same way, would not be capable of forming that judgment. And there are two examples in the record here that make this quite clear. The government called a different bank executive. Besides the two underwriters, the government called a woman named Kim Miser, who was a wholesale account executive. And she testified that her responsibilities included learning underwriting guidelines so she could talk to mortgage brokers. She was marketing the bank's products and she needed to know underwriting guidelines. So she knew much more about underwriting guidelines than any ordinary person would. But when she was asked, well, what about applying those guidelines? How do you evaluate credit history? What stated income is reasonable for a stated occupation? That bank executive said those are underwriting questions that she could not answer. And if she can't engage in that reasoning process, even though she's familiar with the guidelines, an ordinary layperson surely cannot. Could you or did you use that I don't know testimony to undermine the other people's testimony? No, Your Honor. If you have this allegedly top dog who doesn't know, it would seem the jury might be impressed by that fact. Well, the jury may have been, but the reason I emphasize it now is the government's position in this case depends on the notion that underwriting is not specialized, that any person could engage in that reasoning. If another bank executive couldn't, for purposes of whether it fits 701, apart from a jury argument, that testimony shows it's specialized. Did you have that testimony at the time that you made the argument to the judge? No. We moved before trial to exclude. That came out in the trial. At that point, the fact that you happened to get a good answer from a witness later on doesn't on its own undermine the judge's legal reasoning, does it? I mean, you may be a good cross-examiner. I think it undermines the government's position on appeal that underwriting isn't specialized. One other question. These were underwriters in the very people's banks who were involved. This wasn't the professor of underwriting somewhere coming down to tell you what underwriters do generally, right? Wouldn't that be much more like a stonemason may be very specialized in his stonemasonry, but if he says, I did this for my boss or my boss told me to do that, and that was what was at issue. That's why it seemed that these people were talking about their own jobs, weren't they? They were, Your Honor, but they did not underwrite these loans at the time, though. And in fact, neither knew what happened in the actual underwriting. Their analysis was after the fact. But there's something else I want to say about this, and I think this is a critical, critical point, because I think it destroys the government's position on appeal. The notion that this is nothing more than lender-specific guidelines. Now, I think that's wrong because of the White case, and I'll get back to that. There's no on-the-job exception to 701, but step back for a second. The government's position doesn't work on this record because these witnesses, their opinion and analysis was not limited to lender-specific guidelines. So you're right, Judge Boggs, they weren't a professor of underwriting, but the government rooted their analysis in general underwriting principles, and it did that throughout this trial. The analysis of the particular misrepresentation that matters to Mr. Curley's case, the government's attack on that, the government's materiality theory, was rooted in general underwriting principles, and there is no question that that is expert testimony. In opening statement, the government said, the government told the jury, from the beginning of this case, you're going to hear testimony from underwriters who will tell you that underwriters care about three things. Generally, the ability to pay, the motivation to pay, the willingness to pay, and the government, in opening, put it this way, colorfully, underwriters want to see skin in the game. He used that phrase no fewer than nine times in the opening statement, skin in the game, skin in the game. That concept was not in any lender-specific document in this case. It was based on general principles, and it had to be based on general principles because the specific guidelines didn't talk about the cash from borrower statements. So the government got the key witness, Barbara DeMichelle, the key underwriter, to explain the general principles, government's words. As a matter of underwriting, generally, government's words. Do you know the three principles? She talked about those principles, and the government came back to it in closing. Relying on her testimony, the government argued that these particular misrepresentations were material, not just because they violated any given company-specific policy, but because they undermined the entire underwriting process. Thank you, counsel. Your time has expired. You'll have your three minutes for rebuttal. Morning, Your Honors, and may it please the Court. My name is Andrew Greenlee, and I'm here on behalf of Jeff Whaley. I'd like to reserve three minutes. You may. Your Honors, the district court prevented Mr. Whaley from presenting the best evidence of his advice of counsel defense. That is, contemporaneous statements that he made to law enforcement before he knew that he was the target of the investigation. This, in turn, would have negated his intent to... How did that occur? How did they prevent him from presenting any of that evidence? Your Honor, prior to trial, there was a motion to severance. It was a joint motion by both parties. Well, he could have presented it by testifying. Right. And he could not present it to support his own case if he were tried by himself. In other words, he can't use a prior statement made to the government. That would be hearsay, wouldn't it? Well, there's really two responses to that. First, if he were to testify on his own, he could, and this is in our reply brief, he could have used that statement to rehabilitate his own... The second answer to that question really is that it's possible to use it for a non-hearsay purpose. That is, his state of mind at the time that he was engaging in these transactions. If, in fact, his attorney had told him, go to your bank, get these checks that say remitter, such and such name, it doesn't matter whether or not that's true. It matters that there was an attorney who was instructing him to do it, and so it negated his intent to defraud. The district court prevented him from raising this defense. It's also worth noting that this possible defense was mutually antagonistic to the defense of Mr. Curley. That is, Mr. Curley's defense was, I had no idea that they were engaging in these... That the real estate transactions were structured in this way, and that was his defense. The jury could either believe that, or it could believe Mr. Whaley's defense, that I was acting on the advice of counsel. So to fail to grant the motion to sever is, in effect, hamstringing and precluding our client, Mr. Whaley, from presenting his preferred theory of defense, and that is, there was an attorney involved in these transactions. I trusted when I went to closing that this was all above the board. Let's not forget, he was... I'm sorry, I don't follow that. Okay. Yeah, but you can move on, because I'm sure you have other points. Well, no, I'm here to address your questions, Your Honors. No, go ahead. The general theory is that if there was an attorney who was involved in the transactions, Mr. Whaley wasn't the one who prepared the actual loan applications. If there was an attorney who was involved in the transactions... Mr. Curley? He did testify. He did testify. Who was the attorney? The co-defendant. Oh, okay. Curley. And that's the problem here, is that if the co-defendant's theory of defense is, I didn't know anything about the way they structured these transactions, and Mr. Whaley's defense is, there was an attorney on board who told me that this was okay, those defenses clash, and if the jury were to find in favor of one, then it necessarily would mean that they would find against the other, and so there's a conflict there. The best course of action, in our view, is to sever the trials, just as both defendants asked, to allow this defense to reach the jury. When you said that it could have come in for state of mind, whether whatever the attorney told him was true or not, did you try to get it introduced on that basis? Your Honor, to be candid, I didn't. I wasn't representing Mr. Whaley, but the main thrust of the motion to sever was, we want to present this advice of counsel defense, and the way it was resolved was sort of on an ancillary basis, that is, look, this is hearsay in any event, under no circumstances, whether you were tried individually or whether you were tried jointly, would this ever reach the jury, because it's hearsay, and our position primarily was that that's going a bit too far. Well, that's why I was asking if you raised it, that is, it's harder to fault the judge for making that statement or ruling if you didn't say, Your Honor, we recognize it's hearsay, but we can offer it for this limited purpose. Right, that's correct. The original basis, the evidentiary basis for admission, was originally the rule of completeness. The short answer is no, you didn't raise the theory before the judge. The short answer is no, not that particular theory. That's fine. The original theory was on rule of completeness grounds. This Court's precedent is for better or for worse, so that's not going to work. With respect to our position that there was no intent, argument number two, that he lacked any intent to defraud, we would note that there has to be an intent to harm the bank, an intent to defraud the bank. Mr. Whaley here, he was a builder. He spent most of his time on this Black Bear Ridge property building cabins. They told him to show up to the closings because he had checks for him to cover his expenses in building these cabins. Mr. Lee, his testimony was that Mr. Lee told him that you have to cover the closing costs, so here's a check that this is going to cover the closing costs. There really was no evidence to suggest that Mr. Whaley himself intended to defraud the banks. It was primarily that Mr. Whaley participated in, well, really the evidence was that Mr. Whaley was owed money from Mr. Lee and that Mr. Whaley knew that this was a way for Mr. Lee to make money. Mr. Lee recruited the buyers and Mr. Whaley supplied the properties. But that is not to say that Mr. Whaley, in fact, had an intent to defraud the banks at issue. He didn't prepare the paperwork. He was just a builder. Well, but didn't he use, you might say, straw men to make, didn't he change and use an employee of Lee named Ed Walker, for example, to endorse a check and deposit it, and that was a check originally given to him? I mean, why would he do that unless it was to trick somebody? Well, that was, I believe the Walker check was, there was a stop payment put on that check. That was because Mr. Lee's company couldn't cover the amount of the check, if I'm not mistaken. And so to make sure that the transaction closed, Mr. Whaley used his own funds as he primarily did for most of the other transactions as well. Like for Bill Barger, for example, he did the same thing, didn't he? Again, he thought that he was covering the closing costs. For $38,000? That was what he thought he had to do to make sure that the deal was closed. Again, he was acting at the direction of Lee. So they could get the money from SunTrust and the other citizens, the other lender. Right. Again, now, it may seem like this was a long time ago and a galaxy far, far away, but actually back in those times, everybody was making money doing this. So the intent wasn't so much. What happened from that? I mean, that's one of the reasons the whole thing collapsed. Right, the whole thing did collapse, but again, it's about his intent, and he lacked the intent, the specific intent to defraud these banks. I think your time's expired. You have three minutes for rebuttal unless you wanted to pursue it further. Did you have anything else? No, thank you. You may proceed. Good morning. I'm Trey Hamilton. I'm in AUSA with Knoxville, Tennessee, U.S. Attorney's Office. Good morning, everyone. Let me begin by addressing counsel for Mr. Curley's principal arguments, which has to do with the 701 issue. What appears to be the primary issue for the court to consider is whether or not a witness can testify about an employer's practices, that witness's employer's practices, policies, and the application thereof, based on that witness's contemporaneous knowledge of those policies and procedures, that is, in this particular case, these two witnesses were employed at the relevant time, and so they had contemporaneous knowledge of the practices and procedures and policies of their employers, and whether or not they can apply those practices and procedures to after the fact acquired knowledge. That is, at some point later in time, they applied those practices and procedures to transactions that they were not personally involved in. Now, let me take a step here and say that that may not exactly be the precise issue for Ms. Owens because neither defendant appears to dispute the fact that Ms. Owens testified that in 2005 and 2006, she was the supervisor of the division, the lending division at Citizens Bank, that approved the two Citizens Bank loans in question, 1230 Birdness Way and 1437 Eagle Cloud Way. So to some extent, the case could be made, and the government takes this position in its brief, is that she, in fact, oversaw those transactions and precisely what happened to those transactions was imputed to her as the supervisor over that department. She made it clear in her testimony that she was responsible for all of the lending decisions at Citizens Bank at that particular time. So Roe Owens and Barb DeMichael are not exactly the same. But turning to Ms. DeMichael, who was a representative of SunTrust Mortgage, she testified, as the court knows, that in 2005, she too was a supervisor of other underwriters. So not only was she applying SunTrust Mortgage's underwriting guidelines, she was supervising others who were applying those guidelines at the time in question. The court, of course, will observe that the transactions in question were in the fall of 2005 going into the early spring of 2006. Now, what the appellants, particularly Mr. Curley, contends is that the government's central premise is, the way he put it, destroyed because Ms. DeMichael was relying on general principles of underwriting and stating her opinion to the court. That is just factually inaccurate. I don't know another way to state it. And we would point the court to page 11 of our brief where we cite to the transcript pages 2064 to 2065, where Ms. DeMichael says that her testimony was exclusively rooted in her understanding of the guidelines that SunTrust Mortgage had in play at the time and her particular review of those files. It wasn't based on general underwriting principles. She did say that as an underwriter at SunTrust, she looked for three particular issues, the three concerns, the three policy concerns that the appellant stated. But these were not general underwriting principles. These were the underwriting principles that she stated were followed by SunTrust. Now, the other issue or the other basis for Mr. Curley's position is that we know that Ms. DeMichael's testimony is more like 702 expert testimony because if we were to go up to a layperson on the street and ask them, could you please describe underwriting principles of SunTrust for us, that they wouldn't be able to do that. But the court knows that that's hardly what the case law is in this area. It is true that specialized knowledge is a term of art that applies particularly in Rule 702. But if you look at Rule 701, as it was amended in 2000, it said that exclusive except for testimony that would be governed by Rule 702. So the fact that this could be considered to be complicated or something that an ordinary layperson might not necessarily understand does not make it specialized knowledge. And I ask these, I guess I would point the court to the Tampa Bay shipbuilder's decision where in that situation the owners of the company testified what was a reasonable cost for repairing the ship. And certainly you couldn't walk up on the street and someone and say, excuse me, sir, could you tell me what the reasonable cost is for repairing this million-dollar vessel? Of course they couldn't. In the Valencia case where a witness was allowed to testify about what the impact on index changes, the natural gas price of index changes, the indices that were affected by the misrepresentations to those publications, a witness was allowed to testify what impact that had on the company's profits. Same question. A layperson would not be able to provide that testimony without, and here it is, without the particularized knowledge that that particular witness had from working at that employer, in that case Dynergy. This explanation is not inconsistent with the Sixth Circuit's decision in White, and that's a case that the defense would like to place great emphasis on. Of course the court knows in White you were dealing with fiscal intermediaries, not employers of a company that was under investigation or was the subject of an investigation. These fiscal intermediaries received cost reports from the provider who was being targeted for investigation, and the fiscal intermediaries then applied their general industry understanding of Medicare regulations, principles, and procedures. So they took some information that they got not from the provider, but they got from their work as fiscal intermediaries. Basically outside auditors. So they were in that situation, as I believe Judge Clay found, that they were in that situation experts as it relates to the way in which the Medicare guidelines worked. But the court was careful to say that the vast majority of their testimony related to their analysis of the cost reports that were actually submitted. And again, if the touchstone is, well, could we go up to an ordinary layperson and say, could you please explain to us the way in which these cost reports could be evaluated and analyzed using Medicare guidelines? A layperson couldn't do that. But this court held in that situation that the explanation based on those fiscal intermediaries' review of the cost reports was admissible under 701. Mr. Curley's counsel also says that another basis for why it's clear that this was complicated is because Kim Miser, who was questioned at trial, was not able to explain what the guidelines were. And the only reason why I'm following up on this is because, Judge Boggs, you asked a question as to whether or not the fact that this, and I believe the phrase you used, whether this top dog, the fact that this top dog didn't know what the guidelines were, could that have been a cross-examination point? I want to make it clear to the court, and this is clear from the transcript, Kim Miser was no top dog. She was not a bank executive. She was doing nothing more than going around to mortgage brokers like Gateway and letting them know that SunTrust has various products that they ought to consider. Of course, as we know, what mortgage brokers do is that they have a universe of lenders to which they can point the people who come in their door. And Kim Miser was an account representative, and she was called. Of course, the government wanted to make it clear that Kim Miser wasn't out there saying, which we did at trial, please come to SunTrust because SunTrust doesn't care if you lie or cheat on your application. And Kim Miser clarified that for the jury, that that's not what she was doing. When she was cross-examined about her knowledge of the guidelines, no, she didn't have the knowledge of an underwriter. She had the knowledge of someone who was peddling SunTrust mortgage products to Gateway Mortgage. What Mr. Curley's counsel seems to be most concerned about is the fact that Mr. Michael testified that the SunTrust guidelines at issue required a borrower, a buyer, to bring his or her own funds to closing. What's interesting is that if you look at the cross-examination of Mr. Michael, not one time was she asked a question about M1, M2, and M4, which were the telephone book size guidelines that the government put in evidence. And the government did ask Mr. Michael. I asked her, I said, based on these guidelines, did SunTrust require that the borrowers bring their own funds to closing? And she said, yes. Well, there was no question about that under cross-examination. They're the guidelines. They could have asked her. Instead, this position surfaces on appeal. First, in the opening brief, it says, it appears that the guidelines did not require the borrower to bring funds to closing. And then more emphatically, it replied, and even more emphatically today in oral argument, the fact is that she was there. They didn't ask her the questions. And, in fact, the focus of the cross-examination of Vista Michael, the focus of the cross-examination, frankly, was she had put before her, I don't know, several, I don't know the count, several truth in lending statements. And she was shown the truth in lending statement, and basically the point of it was that if a borrower went to full repayment on the amount of money that was borrowed from SunTrust, that rather than paying the original loan balance, they would pay a whole lot more than the original loan balance over the amortization of 30 years. And so, therefore, I think the point was is that SunTrust just wanted to make a lot of interest, and that's the reason why they were willing to look the other way. You know, it was a good effort and an effective point to attack the credibility of SunTrust. I think the United States made a very effective response by putting on proof through Martha Sabine that when SunTrust found out that Gateway Mortgage was up to this fraudulent activity, or at least the buck stopped there with them, that they were responsible for bringing these straw borrowers into SunTrust, they terminated their relationship immediately. And that was in 2006. As we noted at argument at trial, and as we noted in our brief, this was at the height of the mortgage bubble, and had SunTrust been interested in just manufacturing loans based on fraudulent representations to be sold on the secondary market, then they wouldn't have killed the goose that was laying golden eggs in Sevier County, Tennessee in 2006. They would have continued that relationship. Now, another point that we make in our brief that we think that's important to consider at this time as well is that let's just say for the sake of argument, because we are not anywhere close to conceding this, that even Ms. DeMichel's testimony wasn't properly admitted, that there were eight packets of closing instructions that were presented to the jury, and all these closing instructions followed the same language that said that you, Jerry Curley, as owner of Guarantee Land Title, if you are aware that there was fraud in this transaction, if you are aware that the borrower is not bringing his or her own funds to closing, if you find out that a third party is providing funds for this closing, then what are you supposed to do? Stop and call us. And that in and of itself, it demonstrated the materiality of the representation that the line 303 cash from borrower was indeed coming from the borrower. And this is particularly clear when the court considers the materiality instruction that was given to the jury, namely that the jury could find that if there was a natural tendency to influence the decision of the decision-making body, then that's material. The closing instructions themselves say that the lender wants to know this information, if it's happening, to the point that it wants to stop the transaction. So that certainly meets the definition of something having a natural tendency to affect the decision-making body. Moreover, there was another instruction that was given on opinion testimony that certainly made it clear that the jury was to consider the witnesses' qualifications and how they reached those conclusions and to balance those against other instructions regarding credibility of the witnesses, including the point they've already made that these witnesses were clearly attacked based on the institutions that they represented were attacked, their motive was attacked, why they were doing it, that they were just greedy and wanted to make a lot of money in these transactions and therefore did not care that the borrowers were lying to them. And additionally, Your Honor, as a last point as to why this really is much ado about nothing at this point in the proceeding is because Jerry Curley himself, when he testified and I cross-examined him, he admitted that whatever the loan product was, that SunTrust Mortgage wanted to know whether the borrower was bringing his own money to closing and he would have stopped the transaction had he known otherwise. Turning to the other issue that Mr. Whaley raised some issues and I hope I'll be able to get to those, but most important to the government other than this, the issue relating to 701 is the loss calculation because were the court to decide with the defense, this would have far-reaching implications in other 2B1.1 cases, so this issue is very important to the United States. The defendant Curley's position on this is not consistent with the plain language of the application note that's under review. The application note that's under review, of course, is the credits against loss provision and the credits against loss provision states in a situation where you have collateral that in determining the amount of loss, the sentencing court is to take into consideration, this is important, the amount recovered from the disposition of the collateral. Now, the defense's position is that when a lender makes a credit bid at a foreclosure sale and therefore acquires... Credit bid means it's not real money, it's the value of their loan interest. I don't mean interest like percentage, their interest in the loan. Yes, Your Honor, that's my understanding of credit bid. That's when you talk about somebody... In general, when you have a sheriff sale, the lender will very frequently bid in the amount that they have loaned out for it. That's exactly right. They don't have to put new cash in for that. That's exactly right. And the reason for credit bids was not something that was... The reason, the general reasons why they occur is not something that was fully developed on the record below. And that's why we look to the Green case... Isn't there a Supreme Court case directly on point? Your Honor, there is a... The Robers case is a Supreme Court that addressed the Mandatory Victim Restitution Act. And the government's position is that the rationale there certainly supports our position here, but it was interpreting the way in which collateral is treated for restitution awards. We believe that we maintain that the rationale is the same. Yes, sir. Okay. But because it's not precisely the same language, we felt it was important to begin our presentation today with going to the language at issue and its amount recovered. And Judge Boggs, I believe that, in a general sense, you are absolutely correct about the process. I think that the Green case from the Seventh Circuit provides a very good, big-picture understanding of what's happening here and why, in a mortgage fraud context, that is not a reasonable way to determine the value. But getting back to the plain language, while I still have time, if you think about what an amount recovered means, I believe that the plain language of amount means a sum of money, and recovered means that it's actually sold. Now, if you just transfer title from, if you take that security interest that the lender has and you convert that into actual legal and equitable title back to the lender, does that generate an amount recovered? No, all you're doing is you're transferring ownership. And the reason why, of course, lenders do that, which I think the Green case, and the Green case points to other decisions that explain this, lenders do this so that they can better control the outcome of the sale. Obviously, a foreclosure sale at the courthouse steps, there's going to be downward pressure from that by its very nature, downward price pressure from its very nature. So when the lender takes control of it, it can put it in its real estate-owned asset department, the REO asset department, which you've seen in our brief, and then they can list it, and then they can make an effort to market it and sell it for its real market value. So our position is that you start with the plain language of the Credits Against Loss provision, and from that you can determine that no amount has been recovered when there's a transfer. Then if you look at the rationale behind that, and that is to make sure that it actually results in the real loss to the lender, which is the objective of 2B1.1. It's a balancing. It's wanting to give the defendant credit for an amount that's actually recovered and offset that against the actual loss to the lender in this situation. The only time value is a substitute for amount is when the property hasn't been sold before sentencing, when it hasn't actually been sold, and the Credits Against Loss provision says that as much. The government encourages the court to look to the Green decision, which states that... It was actually sold before sentencing. Excuse me? It was actually sold before the sentencing. Yes, in this case it actually was sold. We know what its market value was, at least when it was sold. In principle, the market value at the time they made the credit bid, in principle, might have been different. That is to say, bear with me and see if I sort of understand this. I have a credit, my security interest, for $400,000. Now maybe at that point the market value is $300,000, but nobody's going to come in from the outside and bid $300,000 because they know I've got this credit. They'll never get it. So how does that affect it at all when then it loses value between the two times? If there's a loss in value between the time the lender gets title and then sells it? Right. Well, I think that there are a number of decisions that address this. I think the Mallory decision that we cite in our brief. But there are a number of cases that talk about the foreseeability of a downturn in the market and that even though that happens, that it's foreseeable to the defendant that that could indeed happen. And so that's no reason to look at the credits against loss provision any differently just because there could be a change in value. So it's just basically the defendant having messed up, he doesn't have the right to assess the market and try to sell it ahead of time or something of that sort. Well, I think that a case could be made that if the defendant could show that the lender was just sitting on it to run the clock to increase the loss amount, that's not the case here hypothetically speaking. Normally he wouldn't want to do it. They want to sell it. They're running a business, right? Yeah. I'm just that the credit bid is a little odd in the sense that if the credit bid were simply real cash in your pocket, you might have a real auction and somebody else comes in and bids $200. Well, I can bid $250. He bids $300. I can bid $350 because I've got $400 in my credit bid, but that's not the way it works in the real world. Everybody knows you've got the $400, so nobody's going to bid unless they can top that. Isn't that a fair representation of what actually happens? In an arm's length credit, in a true legitimate credit bid situation, I think that it's driven by market forces. And market forces, you know, and may I answer this question? I'm out of time, but may I answer your question? Market forces outside of a fraudulent context are always going to generate the right result. And I think that the Green case points to the reason why you can't use a credit bid in a mortgage fraud situation is because the value itself has already been inflated through fraud. Okay, thank you. Any other questions, judges? Thank you. Time's expired. We have three minutes for rebuttal. We're on behalf of Mr. Curley. Your Honor, Mr. Greenlee has graciously given me his rebuttal time. You've got the whole six minutes. Go to. Six minutes. To go back to the opinion issue, the testimony on underwriting principles generally, it's at record entry 167, page ID numbers 2131 to 2132. And the government's own words were in underwriting generally, are you familiar with the principles of underwriting? But, and this is the more fundamental point, whether it's underwriting generally or not, some jobs are specialized. And the fact that you learn it on the job doesn't mean you get to analyze it for the jury. It's not a question of the knowledge or the facts themselves. Yes, you can talk about what you saw in your job. And so a business owner can talk about his lost profits. The difference is in the reasoning process. And the business owner cases involve basic math. And they are a traditional exception to the expert rule. So the exception that the government, the exception in the advisory committee notes for business owners that the government is trying to stretch, in this case, doesn't fit here because we're not talking about basic math. And underwriting testimony is not a traditional form of lay opinion testimony. The advisory committee notes explicitly say this. And the Tampa Bay decision from the 11th Circuit. Am I wrong to think that labeling, the label underwriting is leading us into territory that maybe isn't justified? Every time we label it underwriting, we all go to underwriters. They're very talented, well-trained people. But here, the term can be really to describe a person skilled in their work of lending. It could be. And I think depending on the testimony, an underwriter could give lay opinion testimony. But the testimony here didn't just cross the line because it engaged in underwriting analysis, not just I'm an underwriter, this is what I do, this is what I look at. That would be perfectly okay, whether it's an underwriter or a rocket scientist. Just the lenders. Say that again? Just a lender. Well, but they went beyond describing lending practices to understand underwriting itself. And the White case shows why that was wrong. White is not distinguishable in any way that matters. In that case, this court found that a Medicare auditor, the government says they were fiscal intermediaries, but that's because Medicare subcontracted the work. They were Medicare auditors, and this court found that it violated 701 for them to explain Medicare requirements and the meaning of Medicare terms. Now, in that case, that was their job. That wasn't something they learned anywhere else. They were. The only auditing they did was Medicare auditing. And this court said it crossed the line. Auditing, I don't know. I think that we could maybe distinguish that. Auditing is really kind of pedestrian work. Well, but Your Honor, auditors, in that case, the analysis they did was specialized enough, even though they were just auditors, that this court found it crossed the line. And I think what's significant, the testimony in this case went far beyond the testimony in White. In White, the auditors simply explained the requirements. They didn't take the next step and tell the jury, these costs weren't reasonable. This was a related party. They just explained what related party meant. And even that, Judge Cook, even that crossed the line. Here, the auditors, the underwriters, not only explained the requirements, they told the jury, these particular transactions violate the requirements. These particular transactions would have been rejected. The auditors in White didn't go anywhere near that, and it was still too far for this court in White. They were talking about their own employers in response to that, weren't they? They were talking about SunTrust and Citizens. In other words, they weren't giving general abstract opinions about anything. They were talking about basically the practices that were occurring in their own companies. In other words, the question that they had to face was, would your company have made that loan if they knew that the $38,000 or $39,000 down payment was being used to get a loan from you for $600,000 that you're going to give to the very people that came up with the $39,000? What kind of deal is that? That's a perfect deal. If they had known that, I don't think you'd have to be an expert to answer that question. Your Honor, I think you do because it's an underwriting judgment. On this and Judge Quist, the auditors in White were talking about their employer too. Their employer, for practical purposes, was Medicare. There's no difference here. They were talking about their job. What would you have noticed as an auditor? The only person they worked for was Medicare. There's no difference in that respect. There is no distinction with a difference in that respect. Here, the government presented this as an underwriting issue. These were the only underwriters who testified. It wasn't. The only way they could get to that point, which especially now it seems obvious, of course that would matter. The guidelines didn't say that. The guidelines didn't even appear to require a down payment. I think this is important. This is not a sufficiency argument. The government says, well, the closing instruction is this. This is not about sufficiency. The question is, did this testimony contribute to the verdict? The underwriter's testimony went beyond anything in the written record. The closing instruction said that down payments were N-slash-A, not applicable. They tied it together for the jury in a way that no other evidence could. Your Honor, may I say one thing about credit bids? Yes, quickly. I think that the government's position is wrong about credit bids. The lender does not have to bid in the full amount in order to get the property. The lender can bid whatever amount it has to if it thinks the other way. I understand that. It doesn't have to, but as a simple matter, usually it takes four seconds to do one of those things. You walk in. You lay down the whole amount. The only other point I would say on that. If they started with an auction, where if they literally went in and said, you know, $100,000, $200,000, and there's some outsider bidding, then you would have something, but that's just not the way it works, is it? It can work that way. It could, but as a general matter, it doesn't. People, banks, you know, bid in 10 at a time, 100 at a time. Okay, I get the point. Okay. Thank you, Counsel. The case will be submitted.